MINAS K. AROIAN & another *vs.* ISAAC H. FAIRBANKS & another, executors.

Worcester. September 29, 1913. — December 13, 1913.

Present: RUGG, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & DE COURCY, JJ.

*Contract,* Construction. *Practice, Civil,* Conduct of trial; judge's charge.

An agreement in writing for the sale of certain land, which contains provisions that "all clearing of existing encumbrances may be simultaneous with the transfer," and that, "if upon examination a defect is found in the title . . . the time for passing the papers shall be deferred thirty days to allow time for remedying such defect, unless the parties" otherwise agree, and which nowhere contains expressly or by implication a limitation of the examination to the record, does not require the giving of a good record title, and the seller has complied with

the contract if he gives to the purchaser a title free from actual incumbrances although it rests substantially on evidence not appearing upon the records.

A defective record title is a marketable title if a reasonable purchaser, well informed as to the existence and legal significance of facts both within and outside the record, in the exercise of the prudence which business men ordinarily bring to bear on such transactions, would be willing to accept it.

Where, at the trial of an action for the return of a deposit made by the plaintiff with the defendant under the terms of an agreement for the sale of land by the defendant to the plaintiff which required the defendant to give a good marketable title only, the plaintiff contends and introduces evidence tending to show that the record title to the land was defective, and an attorney for a bank which was to have made a loan to the plaintiff secured by a mortgage on the land testifies that the bank refused to make the loan because in his opinion the title was defective, the plaintiff is not harmed if the jury is instructed that the refusal of the bank to take the mortgage was not evidence that the title was not good and marketable.

CONTRACT upon an agreement in writing, the material portion of which is hereafter set out. Writ dated April 25, 1912.

By the agreement the plaintiffs agreed to purchase and the defendants to sell a farm in Westborough formerly owned by one Lyman N. Fairbanks. Material portions of the agreement were as follows:

"And it is agreed further that if either party fails to keep any of his or her stipulations or agreements herein made, the party shall pay the other party five hundred (500) dollars as liquidated damages therefor; and that if the sale herein contemplated fails of consummation through fault of the one herein agreeing to purchase, the deposit made by the last mentioned party, if any, in connection herewith, shall be forfeited to the party herein agreeing to sell and said Leland [the agent who negotiated the sale] retain or receive the same toward payment for his services as aforesaid; and that said Leland shall draft the papers required, and therefore and for any further services rendered or furnished by him for either party hereto to be paid the prevailing rates.

"And it is agreed that said properties shall be conveyed by executor's deed, except for the conditions and exceptions above specified, on or before the 10th day of January, 1912, and the paper passed, and the money paid at the above mentioned office of said Leland, unless otherwise mutually agreed by him and the parties hereto, and all clearing of existing encumbrances may be simultaneous with the transfer and purchase cash used therefor.

"And it is further agreed, if upon examination a defect is found

in the title to said real estate, other than as above set forth, the time for passing the papers shall be deferred thirty days to allow time for remedying such defect, unless the parties hereto and said Leland otherwise mutually agree."

The first count of the declaration was to recover $500 paid to the defendants by the plaintiffs as a deposit, and the second was to recover that sum as liquidated damages.

The case was tried before *Jenney*, J. It appeared that the premises formerly were owned by one Oliver Nourse, who died in 1862, intestate, leaving as his heirs at law three daughters, one of whom, Elizabeth, married one Seth Rice. Rice purchased the interest of his wife's two sisters in the premises, but no conveyance was made to him of his wife's interest. He conveyed the business in 1866 by a deed in which his wife joined merely to release her dower and homestead. The one third undivided interest of Elizabeth Rice remained outstanding of record at the time of the agreement between the plaintiffs and the defendants. Otherwise, the title by conveyances and descent came to the defendants' testate. There was ample evidence to support a contention that any title which Elizabeth Rice ever had was barred by adverse possession.

The plaintiffs called Edgar Weeks, Esquire, for seventeen years an examiner of titles for the Marlborough Savings Bank, who testified without objection that the plaintiffs made application for a loan on the real estate described in the agreement above set out; that a mortgage to the bank to secure the loan was executed by the plaintiffs; that everything which it was customary to do in making such loans, except the examination of title, had been done; that thereupon he examined the title in behalf of the bank; that in his opinion the title was defective; that upon his advice the bank declined to make the loan on account of the defendant's defective record title to the one third part above described.

At the close of the evidence the plaintiffs asked for the following rulings:

"1. The agreement contemplated the giving of a good record title. If the title of the defendants was substantially defective on the record, the plaintiffs were not bound to accept it.

"2. The plaintiffs were not bound to accept a title which might involve them in litigation in its defense.

"3. The plaintiffs were not bound to accept a title which could only be established by oral evidence of adverse possession.

"4. A defective record title is not a marketable title."

The rulings were refused. Material portions of the charge were as follows:

"Now under this form of a contract, for the purposes of this case, I instruct you that it was the duty of the seller in order to comply with the terms of that contract to give to the purchaser a good or marketable title free from actual encumbrances and the title may be clear although it rests partly or substantially on evidence not appearing upon the records. I say 'may be clear' because I am going to tell you by and by what will be sufficient to maintain a good title so far as that question is concerned and I want now simply to call your attention to the fact that it may be sufficient, not that it must be sufficient, if it so depends. It does not require a title absolutely free from all suspicion or possible defect. It is sufficient that if a reasonable purchaser well informed as to the facts and their legal bearings, willing and desirous to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear on such transactions, be willing and ought to accept. If the title depends in whole or in part upon evidence apart from the records, the jury, nevertheless, may find it a good and marketable title if it is proved to a reasonable degree of certainty that the evidence cannot be contradicted and that it will be equally available if needed in the future. The title may be good beyond a reasonable doubt, within the rules which I have given you although there may be questions in regard to it that depend upon substantial evidence and although there may still be a possibility of defect and the remote chance that it may be exposed to litigation and finally seem to be imperfect."

"Something has been said in regard to the Westborough [meaning Marlborough] Bank. There was nothing in this agreement that made the Westborough Bank a judge one way or the other. The refusal of the bank to take the mortgage on the property is not evidence that it was not a good and marketable title as I have laid down to you. They are under no obligation to take the mortgage. They might refuse to take it for any reason and its opinion or the opinion of its officers is not to control you. It is not evidence.

The question is whether the title was good and marketable as I defined it to you. The bank was not made arbitrator, neither was its attorney or its officers."

There was a verdict for the defendants; and the plaintiffs alleged exceptions.

The case was argued at the bar in September, 1913, before *Rugg*, C. J., *Morton, Hammond, Sheldon & De Courcy*, JJ., and afterwards was submitted on briefs to all the justices.

*G. S. Taft*, for the plaintiffs.

*F. F. Dresser*, for the defendants.

HAMMOND, J. The first question is whether the contract called for a good record title. It provided that "if upon examination a defect" should be "found in the title, . . . the time for passing the papers" should be extended so that the defect might be cured unless the parties should otherwise agree.

It plainly appears from this that the parties contemplated an examination of the title. But what kind of examination? Doubtless an examination should extend to the record, but was it to end there? Nowhere in the contract is the character of the examination limited to the record expressly, nor, as it seems to us, by necessary implication. The plaintiffs were to rely upon the title disclosed by an examination and were to rely upon nothing else. Certainly it was for their interest to make such an examination as would disclose the actual state of the title, whether the facts material to that inquiry were to be found in the registry of deeds, the records of the Probate Court, or were well known and easily ascertainable outside of either. The plaintiffs were not confined to the record nor bound by its state alone. If, for instance, the record title upon its face was perfect, but by reason of incapacity of some grantor in the chain of title to make a deed, or by reason of disseisin any deed though perfect on its face was inoperative and the facts though provable only by parol were well known, the plaintiffs would not have been bound to take the title. And for the same reason, if there was a defect in the record title which had been cured by disseisin, as in the present case, and the facts were easily provable, then the title is good and a proper examination as to all matters affecting its validity would show it to be good. The clause giving thirty days within which any defect may be remedied is not conclusive against this interpretation. The pur-

pose of putting a limit on the time within which a defect discovered in the examination must be remedied was doubtless to show that time was of the essence of the contract, and thereby to relieve the vendee from the uncertainties arising when time is not of the essence; as to which see the remarks of Chapman, J., in *Richmond* v. *Gray*, 3 Allen, 25, 28–30. In a word, the plaintiffs were entitled to the benefits and bound by the results of an examination of the real state of the title, provided always that the title was marketable within the meaning of that term as used in this connection. Such an interpretation of the clause in question is suggested by its language, is not inconsistent with any other provision of the contract, and best comports with the interests and situation of the parties. *Noyes* v. *Johnson*, 139 Mass. 436, cited by the plaintiffs, is plainly distinguishable. In *Richmond* v. *Gray, ubi supra*, also cited by the plaintiffs, which was a bill in equity brought by a vendor to enforce specific performance of a contract to purchase certain real estate, the title upon the record and in fact, was defective. The defect was suggested by the record, and upon inquiry *in pais* the suggestion proved true. And the decree dismissing the bill was right, not upon the ground that there was a defect in the record title but upon the ground that the title was in fact defective. In that case the contract, which was brief and somewhat informal, contained the clause "Title to be examined." The remarks by Chapman, J., that the clause implied "that the purchaser was not bound to take the land unless he found a good, record title," and that "a defective record title is not marketable," were not essential to the decision of the case and must be regarded as mere *dicta*. The doctrine that a defective record title is not marketable is repudiated in *Conley* v. *Finn*, 171 Mass. 70, in which case the language of Folger, J., in *Murray* v. *Harway*, 56 N. Y. 337, 344, that "it has been held, that where one of the paper links of title was defective, the lapse might be supplied by parol proof of possession, under color of title, sufficient to establish a good adverse possession; and that such a title is enough on which to found a decree," was cited by Knowlton, J., with approval. The first *dictum* above cited, being founded to a great extent upon the soundness of the second, must fall with it. Neither is a true statement of the law. The majority of the court think that the first ruling re-

quested by the plaintiff was properly refused; and that there is no error in the manner in which the judge dealt with the other requests or in the instructions under which the case was submitted. The charge was full, clear and in accordance with the law. *Conley* v. *Finn,* 171 Mass. 70, and cases cited. *Foster, Hall & Adams Co.* v. *Sayles,* 213 Mass. 319, and cases cited.

The plaintiffs were not prejudiced by the instructions as to the testimony of Weeks. So far as his testimony bore upon the general question that a defective record title is not marketable it was incompetent and of no probative force, and so far as it tended to show the nature of the defect it added nothing.

*Exceptions overruled.*